Argued March 17; affirmed April 5, 1949

# STATE *v.* SCHRIBER
205 P. 2d 149

616

*Warren A. McMinimee,* former District Attorney for Tillamook County, of Tillamook, and *Catharine Carson Barsch,* Assistant Attorney General, of Salem, argued the cause for appellant. With them on the brief were George Neuner, Attorney General, of Salem, and John Hathaway, Deputy District Attorney for Tillamook County, of Tillamook.

*George P. Winslow,* of Tillamook, argued the cause and filed a brief for respondent.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, KELLY and BAILEY, Justices.

LUSK, C. J.

In 1945 the legislature passed an act relating to the control and eradication of Bang's disease in cattle. Ch. 355, Oregon Laws, 1945. Certain amendments were adopted by Ch. 588, Oregon Laws, 1947. Under the Act cattle which are found to be infected with the disease must be slaughtered. Violation of provisions of the Act or of any rule promulgated thereunder by the director of the Department of Agriculture was made a misdemeanor. The defendant was indicted for violating the Act and a rule established by the director by failing to cause or permit to be slaughtered five head of cows which he owned, and which had theretofore been tested in the manner required by law and found to be infected with Bang's disease. He filed a demurrer to the indictment, which the Circuit Court sustained on the ground that the Act was too vague and uncertain to form the basis of a criminal prosecution.

The statute provides in § 2 for the creation of the office of county veterinarian, and that any test re-

quired under the Act, when performed by any United States Department of Agriculture Bureau of Animal Industry veterinarian or by any State Department of Agriculture veterinarian shall be the equivalent of a test made by a county veterinarian. Section 8, as amended by the Laws of 1947, provides in part:

> "It shall be the duty of the county veterinarian to test, except as otherwise herein provided, all female bovine animals and bulls over 6 months of age in the county or territory within the county for which he is appointed, not less than once per annum for Bang's disease (brucellosis) and.for bovine tuberculosis. He shall make concurrently the tests for Bang's disease and tuberculosis. \* \* \* Upon completion of the tests herein provided, all animals found to be infected with bovine tuberculosis shall be disposed of as otherwise provided by law, and every herd owner shall elect in writing, and after consultation with the county veterinarian who has tested his herd, one of the following programs for the control or eradication of Bang's disease (brucellosis) \* \* \* "

disease as a result of any test required by this act In § 9 it is provided:

> "Such county veterinarian shall conduct the testing work provided for in this act in such manner as shall have been approved by the state department of agriculture, and as shall be deemed most effective in the eradication of Bang's disease and tuberculosis and other contagious, infectious and communicable disease of cattle. \* \* \* Those reacting to the Bang's disease test shall be earmarked with a condemnation tag and branded with a two inch 'B' on the left jaw."

Section 14, as amended by Oregon Laws, 1947, provides:

> "Animals found to be infected with Bang's to be performed hereby are required to be slaugh-

tered, and indemnity shall be paid to the owners thereof as hereinafter provided."

The amounts to be paid as indemnity and the procedure for appraisal of infected animals are prescribed.

Section 19 reads:

"The department shall establish such rules and regulations as may be necessary to effectuate the purposes of this act. * * * "

Administrative Order No. AD-336 of the director of the Department of Agriculture, effective March 1, 1948, contains this provision:

"The owner of a bovine animal which has reacted to the official test for Bang's disease shall have such animal slaughtered within fifteen (15) days after the date of the appraisal of said animal following such test, unless such time shall be extended as provided by sub-section 12, section 15, chapter 355, supra. Such slaughter must be done where a veterinarian approved by the Department may examine the carcass and certify that such reactor animal has been killed."

The charging part of the indictment reads as follows:

"The said Joe Schriber on the 28th day of April A. D. 1948, in the said County of Tillamook and State of Oregon, then and there being, and then and there being the owner of certain bovine animals within said county, to-wit: five head of cows, all of which bovine animals theretofore had been tested as required by Chapter 355, Oregon Laws 1945, as amended, and had been found to be infected with Bang's disease (Brucellosis), did then and there wilfully and unlawfully fail and refuse to slaughter said infected bovine animals or cause or permit them to be slaughtered, contrary to the

rules and regulations of the department of agri-
culture of the State of Oregon and contrary to the
statutes in such cases made and provided, and
against the peace and dignity of the State of
Oregon."

We will consider in the order of their presenta-
tion in the defendant's brief the points urged in sup-
port of the demurrer.

■ The first point—upon which the court below
based its ruling—is that the term "Bang's disease" has
no well-defined accepted meaning. Therefore, it is
said, the statute violates "the fundamental principle
that in the creation of an offense which was not a
crime at common law a statute must be sufficiently
certain to show what the legislature intended to pro-
hibit." *State v. Anthony,* 179 Or. 282, 288, 169 P. (2d)
587, cert. den. 330 U. S. 826, 91 L. ed. 1276, 67 S. Ct.
865. Bang's disease, it is said, should have been de-
fined by the legislature. Otherwise the statute is void
for indefiniteness.

We do not agree. "Brucellosis", the word used
in the statute interchangeably with Bang's disease, is
defined in The American Illustrated Medical Diction-
ary, Dorland (21st ed.), 1948, as follows:

"A generalized infection caused by one of the
species of Brucella, namely Br. melitensis of goats,
Br. abortus bovinus of cattle and B. suis of hogs.
Man acquires the disease by drinking infected milk
or by contact with infective material. In man the
disease is marked by remittent undulatory fever,
malaise, cervical pain, headache, sweating, consti-
pation, weakness and anemia. Called also undu-
lant fever * * * "

In Stedman's Medical Dictionary (1939) among
the synonyms for "Bang's bacillus" are "Bacillus

abortus'' and ''Brucella abortus''. This organism is said to be ''the cause of puerperal fever in the cow''. ''Brucellosis'' is defined in the same work as ''infection with some species of the genus Brucella''.

In 1939 I. Forest Huddleson, D.V.M., M.S., Ph. D., research professor in bacteriology, Michigan State College, published a work entitled ''Brucellosis in Man and Animals'', and in 1943 a second edition thereof consisting of 327 pages. In the foreword to the first edition we find the following statements:

> ''Forty years ago Hughes published his Undulant Fever. This work is a medical classic and may be fairly said to contain the available information on the subject at the time of its publication. But simultaneously with its appearance there was announced the discovery of Bang's bacillus and, with the turn of the century, knowledge of what soon came to be recognized as a related group of pathogens increased with bewildering rapidity.''

> ''Brucella abortus (Bang) was first isolated and described by Bang (10), assisted by Stribolt, in 1897. They isolated the organism from the fetuses and fetal membranes of cows that had aborted and later established the fact that it was the cause of infectious abortion of cattle. The disease is now recognized as 'Bang's abortion disease'.''

Included in the second edition of Dr. Huddleson's work is a bibliography containing 485 references to learned writings upon various phases of the subject.

In 1916 the United States Department of Agriculture Bureau of Animal Industry published the first of numerous bulletins, orders and directives relating to Bang's disease, then referred to as ''Bang's bacillus of abortion.'' One such report, issued in May, 1948, contains among other things a summary of brucellosis work in cooperation with the states during the month

of March, 1948, showing that every state in the union and Puerto Rico are cooperating with the United States Department of Agriculture in testing cattle for the disease. 507,934 cattle were tested in the month of March, 1948.

As these reports indicate, legislation for the purpose of controlling and eradicating Bang's disease is quite common if not universal throughout the country. The first Oregon statute on the subject was passed in 1935 (Oregon Laws, 1935, Ch. 432); the next in 1939 (Oregon Laws, 1939, Ch. 503); and in 1945 and 1947 the present legislation was enacted. References to federal statutes and some of the state statutes will be found in the margin.*

The following decisions deal with the subject: *Mintz v. Baldwin,* 289 U. S. 346, 77 L. ed. 1245, 53 S. Ct. 611; *State v. Lovelace,* 228 N. C. 186, 45 S. E. (2d) 48; *State ex rel. Armontrout v. Smith,* 353 Mo. 486, 182 S. W. (2d) 571; *Federal Underwriters Exchange v. Hightower,* (Tex. Civ. App.) 161 S. W. (2d) 338; *Nelson v. West Coast Dairy Co.,* 5 Wash. (2d) 284, 105 P. (2d) 76, 130 A. L. R. 606; *Campoamor v. State Live Stock Sanitary Board,* 136 Fla. 451, 182 So. 277; *Stickley v. Givens,* 176 Va. 548, 11 S. E. (2d) 631. Based

* Public Laws, Ch. 421 (June 25, 1940), 54 Stat. 540; Public Laws, Ch. 267 (July 1, 1941), 55 Stat. 416; Public Laws, Ch. 516 (July 22, 1942), 56 Stat. 674; 21 U. S. C. A., § 114a (1944); Gen. Acts of Alabama (1945), p. 619; 1945 Supp. to Connecticut Gen. Stat., p. 218; 585.10 Florida Stat. (1941), as amended by Laws of Florida (1945), Ch. 22886, p. 974; Laws of Illinois (1945), p. 38; Acts of Indiana (1945), Ch. 174; Laws of Maine (1945), Ch. 275, amending R. S., Ch. 27, § 52; Laws of Minnesota (1945), Ch. 234; Laws of Nebraska (1945), Ch. 131; New Hampshire Laws (1945), Ch. 137, § 5; Laws of New Jersey (1946), Ch. 257; New York Consol. Laws, Ch. 69, §§ 72, 74, 90, and Commissioner's Order October 1, 1932. See Mintz v. Baldwin, supra. Sess. Laws of North Carolina (1945), Ch. 462; Laws of Ohio (1945-1946), p. 151; Sess. Laws of South Dakota (1945), Ch. 174, amending Ch. 169, Sess. Laws 1941; Laws of Wisconsin (1944-1945), Chs. 131, 170, 529; Virginia, Acts of the General Assembly (1938), Ch. 439.

upon historical, scientific and statistical facts, the court in *State v. Lovelace,* supra, in sustaining a statute prohibiting the importation of cattle infected with Bang's disease into North Carolina, said:

"Brucellosis, or Bang's Disease (deriving its name from two scientists studying in this field), as it applies to the bovine type of bacillus, is described as being both infectious and contagious. It is spread from animal to animal by the consumption of feed and water soiled or contaminated with brucellosis organisms. By consumption the germs are carried through the blood vessels to the various parts of the animal's body. The udders of the cows are affected, and discharge the germs with the milk. The disease is transmitted to man through the drinking of the milk and contact with the animals, and is known, when so caused, as undulant fever, not usually fatal, but disabling. It can only be eliminated by eradication at the source.

"In cattle the disease results in premature birth, lower productivity, and lower birth rate. It is generally understood that the only effective method of eliminating the disease is by slaughter of the animals found infected, and it is often the case that the whole herd must be disposed of."

During the past several years Bang's disease in cattle and undulant fever caused thereby in human beings have been widely discussed in the public press of this state. The defendant's brief itself contains references which indicate an easy familiarity with the term Bang's disease among those having a special interest in animal husbandry. These consist of reports of the proceedings of such organizations as the Washington State Dairymen's Association and the United States Livestock Sanitary Association and articles in

farmers' and dairymen's magazines about these proceedings.

Extension Bulletin No. 682, published in October, 1947, by Oregon State College in conjunction with the Federal Cooperative Extension Service, is a pamphlet entitled "Brucellosis of Cattle (Bang's disease)" by O. H. Muth, department of veterinary medicine of Oregon State College. With other pertinent information this pamphlet shows that Oregon cattle have been tested for Bang's disease for every year beginning in 1929; that the disease is caused by the bacterium "Brucella abortus" and is common in Oregon; that the act of aborting is the only easily recognized symptom, although it is not proof of the existence of the disease because animals abort from other causes; that the "blood agglutination test" is the only reliable method of diagnosing Brucellosis in cattle; that the test is very accurate; and that the laboratory at Oregon State College has conducted over 4,000,000 such tests during the past twenty-eight years.

It is well-established that courts take judicial notice of medical and other scientific facts relating to human life and health and that, since judicial cognizance may extend to matters beyond the actual knowledge of the judge, he may properly resort for information to dictionaries, encyclopedias, learned treatises and the like. It is said: "Those matters familiarly known * * * to those persons familiar with the particular matter in question are properly within the concept of judicial notice." 20 Am. Jur., Evidence, 50, § 18. Notorious facts concerning disease and injuries of animals are judicially known. 31 C. J. S., Evidence, 682, § 87, Note 71. "Most matters which the court may notice fall into one of two classes, those which come

to the knowledge of men generally in the course of ordinary experience of life, and are therefore in the mind of the trier, or those which are generally accepted by mankind as true and are capable of ready demonstration by means commonly recognized as authoritative." 31 C. J. S., Evidence, 510, § 7. We are dealing here with a subject of the latter sort. As we have seen, the North Carolina court has taken judicial notice that Bang's disease is an infectious malady, dangerous alike to man and beast. *State v. Lovelace,* supra. The trustworthy sources of information to which we have referred—and which constitute but a small part of the literature on the subject—and the numerous statutes, federal and state, designed to curb the evil, are ample warrant for this court pursuing the same course. For analagous cases see *State v. Main,* 69 Conn. 123, 37 Atl. 80, 36 L. R. A. 623; *McSween v. State Live Stock Sanitary Board of Florida,* 97 Fla. 750, 122 So. 239, 65 A. L. R. 508; *Pfeffer v. Milwaukee,* 171 Wis. 514, 177 N. W. 850, 10 A. L. R. 128; *McCauley v. Imperial Woolen Co.,* 261 Pa. 312, 104 Atl. 617; *In re Estate of Visaxis,* 95 Cal. App. 617, 273 P. 165.

 It appears that the only dictionary definition (apart from medical dictionaries) of Bang's disease is that found in Webster's New International Dictionary (1941 ed.)—"Infectious abortion". The defendant argues that this is not an adequate definition because the disease occurs in both male and female bovine, and abortion is only one of its symptoms. From this premise it is concluded that Bang's disease has no accepted meaning. Such was the view of the trial judge. In our opinion, however, the dictionary definition, "infectious abortion", was not intended to delimit the disease to cases where abortions occur. We have quoted

the statement from Huddleson's work that "Brucella abortus was first isolated and described by Bang * * * in 1897", and that "The disease is now recognized as 'Bang's abortion disease'." The name evidently was adopted because of the known fact that in many instances cattle abort following initial infection. Huddleson says (p. 184) that there are considerable data that this occurs in about seventy per cent of pregnant cattle. The truth is that "infectious abortion" is but another name for Bang's disease (United States Department of Agriculture, Farmers' Bulletin No. 1704, Bang's Disease (Infectious Abortion), July, 1933, p. 1. The fact that there is a dictionary definition of Bang's disease indicates, to some extent at least, that the existence of the disease is a matter of common knowledge. The fact that a dictionary definition fails to disclose completely and accurately all the manifestations of the disease is not sufficient basis for concluding that the name which it bears has no accepted and commonly understood meaning. In this instance we think it is a matter of common knowledge in this state, and more particularly in Tillamook County, which is famous for its dairy industry, that Bang's disease is an infectious and contagious disease of cattle. So far as the present question is concerned, that is enough. For that reason the contention that the statute is indefinite and that the term has no accepted meaning cannot be sustained.

The indictment is said to be defective because it fails to allege that the animals of the defendant were not beef animals or animals kept for beef purposes. Section 10 of the Act provides that every female bovine animal shall be tested for Bang's disease at least once every twelve months "provided, that no beef animals

or animals kept principally for beef purposes shall be required to be tested". The question is whether it was necessary for the pleader to negative this exception. The rule in this regard was stated by Mr. Justice ROBERT S. BEAN in the early case of *State v. Tamler*, 19 Or. 528, 530, 25 P. 71, 9 L. R. A. 853, as follows:

" \* \* \* When the exceptions or provisos are a material part of the description of the offense, it is necessary to negative them in the indictment: The indictment must contain such averments as show affirmatively an offense; and where the exceptions or provisos are a material part of the description of the offense, the indictment must aver that the act charged does not come within the exception or proviso. The exceptions should be negatived only when they are descriptive of the offense, or a necessary ingredient of its definition; but when they afford matter of excuse merely, they are matters of defense and therefore need not be negatived in the indictment."

█ There has been no departure in the decisions of this court from the principles thus enunciated. See *State v. Burroughs*, 130 Or. 480, 486, 280 P. 653; *State v. Gilson*, 113 Or. 202, 232 P. 621; *State v. Rosasco*, 103 Or. 343, 353, 205 P. 290. In the Burroughs case the defendant was charged with the unlawful practice of medicine without a license from the Board of Medical Examiners of the State of Oregon. The act contained fifteen exemptions, such, for example, as practice by a medical officer of the United States Army, Navy, or Public Health Service. In the Rosasco case the prosecution was for violation of the prohibition law by possessing intoxicating liquor. The statute provided that it should not be so construed as to prevent the making or selling of vinegar. In the Tamler case the indictment charged that the defendants sold

whiskey without having obtained a license from the County Court of Multnomah County for that purpose. The statute excepted incorporated cities and towns from its application. In each of the foregoing cases it was claimed that the indictment was defective because it failed to negative the exception, and in each the court held that the exception was "no part whatever of the description of the offense nor a necessary ingredient of its definition, but * * * simply a limitation in the application of the provisions of the act." *State v. Tamler*, supra. We think that is true of the exception in the Act under consideration with respect to beef animals and animals kept primarily for beef purposes, and therefore hold that the state was not required to negative this exception.

It is next contended that the indictment is defective because it fails to charge that the defendant's animals had been appraised. This criticism, in our opinion, is valid. In § 14 of the Act, as amended, it is provided that animals found to be infected with Bang's disease as a result of any test required by the Act "are required to be slaughtered, and indemnity shall be paid to the owners thereof as hereinafter provided." It is further provided: "The appraisal, procedure and court order for the payment of indemnity for animals required to be slaughtered on account of having been found to be infected with Bang's disease or tuberculosis shall be as provided by sections 32-307 and 32-308." The Oregon Department of Agriculture, as stated, established a rule providing, among other things, that the owner of a bovine animal which has reacted to the official test for Bang's disease "shall have such animal slaughtered within fifteen (15) days after the date of the appraisal of said animal following such test, unless such time shall be extended as

provided by sub-section 12, section 15, chapter 355 * * * '' That subsection authorizes an extension of time in certain circumstances, not greater than thirty days from the date of appraisal. The regulation is within the scope and expressed general purpose of the Act, is valid, and has the effect of law. 42 Am. Jur., Public Administrative Law, §§ 49, 50. Apparently it was adopted because the statute itself is somewhat indefinite in that it fails to state by whom and when an infected animal shall be slaughtered. The indictment obviously charges a violation of the regulation as well as of the statute. Now, under the regulation, the duty of the owner to slaughter an infected animal does not arise until the animal has been appraised, and that duty may be complied with within fifteen days after the date of such appraisal or within any extension of that time as authorized by subsect. 12, § 15. It follows that the offense set forth in the statute, as supplemented by the regulation, is not adequately described unless the indictment states the existence of facts—the appraisal and the lapse of the prescribed time—without which there could be no violation. On this ground we are of the opinion that the indictment is vulnerable to the defendant's demurrer.

■ The indictment is assailed because of the use of the disjunctive instead of the conjunctive in charging that the defendant "did then and there wilfully and unlawfully fail and refuse to slaughter said infected bovine animals or cause or permit them to be slaughtered". This form of pleading is claimed to violate the rule recognized in this, as in most other jurisdictions, that:

" * * * When the statute makes it a crime to do this or that, mentioning several things disjunc-

tively, the indictment may, as a general rule, embrace the whole in a single count, but it must use the conjunctive 'and' where 'or' occurs in the statute, else it will be defective for uncertainty." *State v. Carr,* 6 Or. 133, 135.

See, also, *State v. Metcalf,* 129 Or. 577, 593, 278 P. 974; *State v. Robinson,* 120 Or. 508, 512, 252 P. 951; *State v. Bilyeu,* 64 Or. 177, 180, 129 P. 768; *State v. White,* 48 Or. 416, 421, 87 P. 137; *Cranor v. Albany,* 43 Or. 144, 147, 71 P. 1042.

It should first be observed that neither the statute nor the regulation which the defendant is accused of violating makes it a crime to "do this or that". Together they simply impose upon the owner of cattle, which have been tested and found to be infected, the duty of seeing to it that they are slaughtered. Evidently conceiving that this injunction might be obeyed in several different ways, the pleader was at pains to allege that it was not done in any of them—neither by the owner slaughtering the animals himself nor by causing or permitting anyone else to slaughter them. The reason for the rule which the defendant invokes is that it avoids uncertainty. For example, where the indictment charged, following the language of the statute, that the defendant, a bailee of wheat, did "fail, neglect, and refuse to keep or account for the said wheat", there was a doubt as to which offense was intended, and so it was said that the pleader might allege both cumulatively as one crime without making the indictment duplicitous. See *State v. Humphreys,* 43 Or. 44, 46, 47, 70 P. 824.

*Ratio cessante, cessat ipsa lex.* The use of the disjunctive in the present indictment, instead of creating a doubt as to what offense is intended, serves, by

negativing the various ways in which the defendant might have performed his statutory duty, to make definite and certain the charge that he failed and refused to do so.

The distinction is made with clarity and persuasive force in *State v. Smith*, 29 R. I. 513, 72 Atl. 710, which was a prosecution for violation of a statute which provided that the driver of a motor vehicle, after knowingly causing an accident or knowingly injuring any person, horse or vehicle, "shall forthwith bring his motor vehicle to a full stop, return to the scene of the accident", etc. The complaint charged that the defendant did not "forthwith bring said motor vehicle to a full stop, or return to said scene of said accident", and it was contended that the complaint was bad because of the use of the word "or". As to this the court said:

"It is true that usually the pleader may use the word 'and' when the word 'or' is used in the statute. But it is worthy of consideration that statutes commonly forbid the commission of specified acts. From time immemorial the phrase, 'Thou shalt not', has been held to contain apt words of prohibition. But the statute in question differs from prohibitory ones, in that it commands that certain things shall be done and provides a penalty for the nonperformance thereof. Consequently a complaint brought thereunder must charge a defendant with inaction where action is commanded. The reason that the use of the word 'or' is inadmissible in complaints charging a defendant with the violation of prohibitory statutes is because it tends to leave the averment uncertain as to which of two or more things charged is meant—as, for instance, to charge that the defendant did sell or suffer to be sold anything prohibited leaves a doubt in the mind of the reader as to which offense is

intended; whereas, if the charge is that the defendant did sell and suffer to be sold the forbidden things, it is certain that he is charged with both selling and suffering the same to be sold. Therefore certainty is the prime requisite. But in a complaint charging the violation of a statute in which action is commanded the use of the conjunctive word 'and' instead of the disjunctive 'or' would not make the allegation more certain.

"Suppose, for example, the requirement of a statute to be that certain persons shall sell or suffer to be sold certain merchandise, and that in a complaint made for the violation of the same the charge against the defendant to be that he did not sell and suffer to be sold the things commanded. In such a case the charge would be indefinite, because a charge that the defendant did not do both would not rebut the inference that he may have done one or the other, which would be a compliance with the statute; whereas, if the charge were that he did not sell or suffer to be sold, it would directly and in terms negative the doing of either. Therefore negative averments should be charged disjunctively. The word 'or' is a proper connective in pleading negative averments. Bish. Direc. & Forms, § 420, note 10. State v. Carver, 12 R. I. 286; Bish. Stat. Cr. § 1043. The word 'or' was properly used in the complaint in the case at bar."

See, also, 31 C. J., Indictments and Informations, 664 § 181; 42 C. J. S., Indictments and Information, § 101.

■ For the reasons thus stated by the Rhode Island court, which are fully applicable to the indictment in this case, the defendant's contention cannot be sustained.

■ The next objection is based upon the language of the indictment that the defendant's animals "had been tested as required by Chapter 355, Oregon

Laws, 1945, as amended". This is said to be a conclusion of law rendering the indictment insufficient. The facts comprehended by the allegation do not constitute the offense, but are merely those required to be set forth by way of inducement. The rule is that it is not necessary to aver matters of inducement with the degree of minuteness and particularly which is requisite in setting out the material allegations which constitute and give character to the offense charged. 42 C. J. S., Indictments and Informations, 988, § 105; 31 C. J., Indictments and Informations, 666, § 185; Joyce on Indictments (2d ed.) 343, § 310. The court takes judicial notice of the provisions of the statute and, as a rule, matters of which the court can or will take judicial notice need not be pleaded. *State v. Stone,* 111 Or. 227, 235, 226 P. 430; 42 C. J. S., Indictments and Informations, 993, § 113. "The purpose of an indictment is to clearly and definitely apprise a person of the crime with which he is charged, in order that he may prepare his defense." *State v. King,* 165 Or. 26, 29, 103 P. (2d) 751. It seems to us that in so far as the criticism under discussion is concerned, the present indictment accomplishes that purpose. And, since liberal rules are particularly applicable in favor of indictments for statutory misdemeanors (27 Am. Jur., Indictments and Informations, 619, § 51, 662, § 102; Joyce on Indictments (2d ed.) 329, § 294), we are the more inclined to hold the averment in question to be sufficient, especially as it is easily conceivable that if a different view were taken, in some cases, if not indeed in this one, an almost intolerable burden of alleging as mere matter of inducement all the details of what the law required would be imposed upon the pleader, without adding anything substantial to the defendant's knowledge of the charge that he must face.

■ In this connection it is argued by the defendant that there is a serious question as to what method of testing is required by law. It is said in defendant's brief that the law requires that all testing shall be done by the county veterinarian, but that by paragraph 12 of Administrative Order No. AD-336 the Department of Agriculture has provided for official tests to be made by the United States Bureau of Animal Industry laboratory at Corvallis, and private tests to be made by the Oregon State College laboratory at Corvallis, or any other laboratory approved by the United States Bureau of Animal Industry. It is intimated that the administrative order is an attempt to repeal the express provisions of the statute. In our opinion this is a mistaken view. It is provided in § 2 of Ch. 558, quoted above, that a test performed by any United States Department of Agriculture veterinarian is to be considered as the equivalent of a test made by a county veterinarian. The test used under the administrative order to determine whether an animal must be slaughtered is designated an "official" test, and the order directs that "official" tests will be made by the United States Bureau of Animal Industry laboratory at Corvallis. The order, therefore, is clearly within the provisions of the statute, since there is nothing in the order which purports to authorize anyone other than a veterinarian included within the provisions of § 2 to make the test.

■■ It is next contended that the statute is vague because in § 14 it provides that the appraisal, procedure and court order for payment of animals required to be slaughtered because infected with Bang's disease "shall be as provided in Sections 32-307 and 32-308." Counsel say that they are unable to determine what

document, book or administrative order is referred to in this provision. We think the reference is obviously to §§ 32-307 and 32-308, O. C. L. A., which deal with the subject of appraisal and indemnity in the case of animals slaughtered because found to be affected with tuberculosis and paratuberculosis. See *Noble v. Noble,* 164 Or. 538, 546, 103 P. (2d) 293. Careless in legislative draftsmanship should not close a court's eyes to obvious legislative intent.

■ In § 16 of the Act provision is made for determining whether the discontinuance of Bang's disease testing will be to the best interest of a particular county, and the county court is authorized in that event to discontinue the testing program for a year. In § 7 it is provided:

"The county veterinarian shall at all times work under the general supervision of the state department of agriculture under such a plan for the conduct of the testing program in each county as shall be jointly agreed to in writing by the county court and the department."

The defendant contends that since there is no reference to these provisions in the indictment it is not shown that Tillamook County cattle are subject to the Act. We think that the Act subjects cattle in the entire state to its provisions. If for any reason provided in the statute Tillamook County has been excepted, that is a matter of defense, as shown by the authorities cited in the discussion above of the exception relating to beef animals.

■ Defendant next argues that it would have been impossible for the defendant to have been guilty of the alleged offense because between March 9, 1948, the day Administrative Order No. AD-336 became effec-

tive, and April 28, 1948, the date of the alleged offense, sufficient time could not possibly have elapsed to test the animals and appraise them and leave fifteen days (the time allowed by the order after the appraisal) in which to slaughter the animals. To sustain this contention the court would have to indulge in wholly unjustified assumptions. We find no merit in the contention.

Finally, the defendant raises questions respecting the constitutionality of the Act. His counsel concedes that "If the Act is limited to the control of contagious and communicable diseases the Act is probably constitutional." But it is said, in substance, that if the Act is construed so as to preclude a defendant from showing that his animals were not in fact diseased, or from showing that the fact that the animals reacted to the test used by the officer is not conclusive, then the Act would be repugnant to both the federal and state constitutions.

It is established beyond all controversy that a law enacted by the state to prevent the spread of contagious or infectious diseases among animals is a valid exercise of the police power, and that to accomplish this legitimate end the state may, without violating the guarantee of due process, authorize the destruction of such animals by summary proceedings. As stated nearly fifty years ago in *Lawton v. Steele,* 152 U. S. 133, 38 L. ed. 385, 14 S. Ct. 499, the police power "is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance", and under this power the state may order "the slaughter of diseased cattle". No judicial hearing is required

beforehand to satisfy constitutional guarantees, for in dealing with a threatened epidemic among animals, which constitutes as well a menace to the health of human beings, the very purpose of the law might be defeated by the delay incident to such a hearing. If the official charged with the enforcement of the law acts oppressively, or even if he makes a mistake and animals are slaughtered which are not in fact diseased, then the requirements of due process are satisfied by an action for damages at common law which the owner may bring against the officer. While our statute does not provide for such an action the law implies the right to maintain it. Nor is it necessary that the legislature authorize compensation to be paid to the owner for animals so destroyed, although our statute does contain such a provision.

The foregoing principles are well settled, and, so far as we are advised, there is no dissent respecting them in the authorities. See 16 C. J. S., Constitutional Law, 1485, § 705; 11 Am. Jur., Constitutional Law, 1024, § 272; 2 Am. Jur., Agriculture, 433-437, §§ 39, 40; idem, Animals, 810, § 160; *Loftus v. Department of Agriculture,* 211 Ia. 566, 232 N. W. 412, app. dis. 283 U. S. 809, 75 L. ed. 1427, 51 S. Ct. 647; *Campoamor v. State Live Stock Sanitary Board,* supra; *Stickley v. Givens,* supra; *State v. Main,* supra; *Miller v. Schoene, State Entomologist,* 276 U. S. 272, 72 L. ed. 568, 48 S. Ct. 246; *Stanislaus County Dairymen's Protective Association v. Stanislaus County,* 8 Cal. (2d) 378, 65 P. (2d) 1305; *Affonso Bros. v. Brock,* 29 Cal. App. (2d) 26, 84 P. (2d) 515; Annotation, 8 A. L. R. 69 et seq.; *Coelho v. Truckell,* 9 Cal. App. (2d) 47, 48 P. (2d) 697, 701; *Aguiar & Bello v. Brock,* 24 F. Supp. 692 (Dist. Ct., S. D. Cal., N. D.); *State v. Lovelace,* supra.

We do not deem it proper, however, at this time to pass on the particular constitutional questions which counsel have raised. They are not before us and could only arise upon the trial of the case. It will be time enough to consider them when a defendant seeks to contest the accuracy of whatever tests are shown to be employed or to introduce evidence in support of a claim that his cattle were not in fact infected with Bang's disease. The demurrer presents no such questions.

Our conclusion is that the statute under which this prosecution is brought is not invalid or unenforceable for indefiniteness or uncertainty in its provisions, as contended by the defendant, and is, so far as any question before us is concerned, a statute enacted by the legislature in the exercise of its sovereign reserved power to provide for the health and safety of the inhabitants of the state, and free from constitutional objections. The indictment is defective, however, in the one particular above pointed out, and the judgment is therefore affirmed.